IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A FLASH DRIVE CONTAINING FILTERED DATA EXTRACTED FROM THE APPLE IPHONE 11 PRO BEARING IMEI NUMBER 353235100545552 CURRENTLY LOCATED AT 2211 HYDRAULIC ROAD, SUITE 201, CHARLOTTESVILLE, VA 22901 | Case No. __3:22-mj-51__ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Scott Medearis, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the FBI and have been so employed since April 2009. I attended and graduated from the FBI Academy in Quantico, Virginia. During my 20 weeks at the Academy, I received training on federal criminal procedure and investigative techniques to include interviewing witnesses and subjects, physical and electronic surveillance, undercover operations, and confidential human source operations, among others.

2. In my investigative experience, I have personally conducted hundreds of interviews, debriefed and operated several confidential human sources, installed and monitored electronic surveillance devise such as pole cameras and GPS tracking devices, planned and executed undercover operations, obtained and executed search and arrest warrants and monitored Title-III wire intercepts.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter, which is an ongoing investigation.

4.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—a

flash drive containing data retrieved from an electronic device—which is currently in law

enforcement possession, and the extraction from that property of electronically stored

information described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is a SanDisk flash drive bearing serial number

BQ2203001185W (hereinafter the "Device") containing filtered data extracted from an Apple

iPhone 11 Pro, International Mobile Equipment Identity ("IMEI") number 353235100545552

(hereinafter the "iPhone"), pursuant to a federal search warrant. The Device is currently located

in the evidence control room of the FBI's Charlottesville Resident Agency located at 2211

Hydraulic Road, Suite 201, Charlottesville, VA 22901.

6.      The applied-for warrant would authorize the forensic examination of the Device

for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### Background

7.      Culpeper County is a political subdivision in the Commonwealth of Virginia. It is

located in the Western District of Virginia. Culpeper County has received more than $10,000 in

Federal assistance in each of the fiscal years 2015 through 2021. The Culpeper County Sheriff's

Office ("CCSO") is a government agency of Culpeper County.

8.      Scott Jenkins ("Jenkins") is the Sheriff of Culpeper County. Jenkins was first

elected in November 2011 and has since won re-election twice, most recently in November 2019.

2

9.      According to campaign finance reports filed with Culpeper County, "Scott Jenkins for Sheriff" ("the Committee") is the name of a Candidate Committee. According to the Virginia Department of Elections, a Candidate Committee is "the committee designated by a candidate to receive all contributions and make all expenditures for them or on their behalf in connection with their nomination or election."

10.     Law enforcement agencies in the Commonwealth of Virginia can utilize reserve or auxiliary officers and deputies according to section 15.2-1731 of the Code of Virginia, which states in part, "Localities… may establish, equip, and maintain auxiliary police forces that have all the powers and authority and all the immunities of full-time law-enforcement officers…" According to its website, the Virginia Department of Criminal Justice Services ("DCJS") recognizes three levels of auxiliary police officers or sheriff's deputies, terms which I use interchangeably in this affidavit. These levels dictate the type and duration of required training, the types of law enforcement and investigative activities the auxiliary officer is allowed to conduct, and whether the auxiliary officer is authorized to carry a firearm. Also, according to its website, DCJS maintains records regarding hiring, training, certification, promotions, name changes, job changes, and retirement for all law enforcement officers in Virginia to include auxiliary police officers.

11.     DCJS has implemented an online platform named "TRACER" for law enforcement agencies to upload these records to include records for auxiliary deputies. Alternatively, after advising DCJS as to the hiring or termination of personnel, a law enforcement agency may choose to maintain hard copy personnel and training records in their physical office space. Regardless of which method a law enforcement agency uses to maintain

3

their records, the agency is required to notify DCJS of the hiring or termination of any sworn

personnel to include auxiliary deputies.

## Payments for Auxiliary Deputy Status

12. In the summer of 2021, a cooperating witness ("CW") brought information to the
FBI regarding a scheme in which individuals paid money to Jenkins in exchange for deputization
as auxiliary police officers and other favors. This CW is facing federal criminal charges in an
unrelated matter and provided the information for potential consideration relative to those
charges. The CW has been interviewed by the FBI multiple times. The CW also provided the
FBI with documents and copies of communications. No promises have been made to the CW in
exchange for his provision of information.

13. The CW is a resident of Virginia, but not Culpeper County. The CW is a
businessperson who owns several companies.

14. The CW stated that they had personally made contributions to Jenkins's re-
election campaigns in exchange for being sworn in as an auxiliary police officer in the CCSO.
Specifically, one needed to contribute $5,000 to the campaign in order to be sworn in as an
auxiliary police officer. At Jenkins's request, the CW recruited individuals to make such
contributions to Jenkins's re-election campaigns in exchange for auxiliary deputization and knew
of at least eight individuals who were sworn as auxiliary officers in exchange for contributions.

15. I reviewed the Committee's publicly available campaign finance filings for the
time period of January 1, 2015, through December 31, 2021. The reports recorded contributions
received and expenditures made by the Committee. These filings documented three
contributions of $5,000 made by the CW and seven contributions of $5,000 or more from four of
the individuals identified by the CW as noted in the table below:

4

| Date of Contribution | Amount of Contribution | Contributor |
|---|---|---|
| January 1, 2015 | $7,500 | █████████ |
| April 29, 2015 | $5,000 | █████████ |
| September 29, 2015 | $5,000 | █████████ |
| September 11, 2017 | $7,500 | █████████ |
| December 29, 2018 | $5,000 | █████████ |
| March 27, 2019 | $5,000 | █████████ |
| August 8, 2019 | $5,000 | █████████ |

16.    These contributions stand out when compared against the other contributions received by the Committee for two reasons. Specifically, none of the individuals identified by the CW are recorded as residing in Culpeper County. By contrast, of the approximately sixty

5

other contributions recorded in the Committee's campaign finance reports,[1] forty-six were made by individuals recorded as residing in Culpeper County. Furthermore, the average amount of the 60 other contributions was approximately $659. Thus, the contributions of the CW and the individuals identified by the CW were approximately 7.5 times the average contribution reported by the Committee.

17.    I reviewed DCJS records regarding auxiliary deputies sworn in to the CCSO. During the time period of January 1, 2015, through the March 2022, CCSO has filed paperwork for ten auxiliary deputies, none of whom are listed in the above table nor include the CW.

18.    It should be noted that the CW claimed to have recruited at least two additional individuals who were sworn in as CCSO auxiliary deputies but for which the Committee's publicly available records did not reflect contributions to Jenkins's election campaign(s).

███████████

19.    One of the individuals identified by the CW as having paid money in exchange for auxiliary deputy status was ███████████ is a businessman who lives and works in the Northern Virginia area.

20.    The CW stated they introduced ███ to Jenkins for the purpose of having ██ make a contribution to Jenkins's campaign in exchange for being sworn as a reserve CCSO deputy. As noted in the table above, the Committee listed ███ as making a $5,000 contribution on December 29, 2018.

21.    I have reviewed records for the Committee's bank account ending in -133 and

---

[1] The Committee's campaign finance reports listed approximately seventy contributions. The Committee's bank records show additional contributions in the amounts of $100 or less. According to campaign finance laws of Virginia, contributions of $100 or less are "un-itemized" and as such, the donor's name and identifying information do not need to be reported. While analysis of the bank records is ongoing, preliminary review indicates most (approximately two-thirds) of the unreported contributions are from residents of Culpeper County. There are several cash deposits into the Committee's account. Except as discussed herein, I am unable to determine the source of the cash deposits at this time.

maintained at Blue Ridge Bank. Those records showed a $5,000 check written from ▇▇▇ ▇▇▇ account and made payable to "Scott Jenkins for Sheriff." The check was dated December 29, 2018, and was deposited to account -133 on January 11, 2019.

22.    I have reviewed the communications provided by the CW, which included text messages the CW exchanged with Jenkins. Certain communications they exchanged regarding ▇▇▇ are discussed below. All messages are verbatim unless otherwise noted.

23.    On March 15, 2018, the CW and Jenkins had the following exchange:

CW:    Hey. You gonna make Gala Saturday. I was hoping to introduce you to two Big Money guys I'd like to get into the program and help you.

SJ:    Hey [CW's first name]! Sorry but it's been crazy around here. I've got the NRA banquet and a fire dept banquet here same time tomorrow and in light of my stance I've been taking publicly on the hole gun rights issue and they want me to say few words at NRA dinner I'm going to miss your gala and do the two events here. I apologize. I never want to miss one but big picture I really need to be here tomorrow.

       I'd love to run down and take your guys to lunch one day if y'all are available.

24.    The two exchanged other messages seemingly unrelated to ▇▇▇ and then the conversation continued on March 31, 2018:

CW:    Hey I got two great awesome guys that come in as supporters. Want tight to meet them. Big $$ excellent reputation. ▇▇▇ is ▇▇▇▇▇▇▇▇▇▇▇ n bulk run Harley. Have 10k to [Non-Profit organization affiliated with CW]. They wanna get sworn n will be there when you need them big $$. ▇▇▇ was a great deputy with me at PW FYI. Can we set up a Mert n greet later this week?

SJ:    [addresses previous unrelated text messages]
       Sure. My first three days are packed but Thursday Friday ok or following week too

7

CW:   [responds to unrelated message]

These other guys are awesome.

25.    On April 5, 2018, the CW texted Jenkins pictures of two driver's licenses. The first belongs to the "███ identified in the earlier texts, and the second belongs to ███ The text exchange then continued as follows:

CW:   These are the two friends I told you about. Big [Non-Profit organization affiliated with the CW] supporters, Big $$$$. They can help a lot. Can we set up a meet n greet next week?

███ is ███████████ and ███ is multimillionaire n good buddy to us both n huge [Non-Profit organization affiliated with the CW] supporter. ███ was deputy in PW with me for many years. Both great guys with outstanding ethics and reputations.

SJ:   Hey [CW's first name]. Sorry but been crazy here. Yea next week is fine. Would Wednesday or Friday work for you guys?

Actually Wednesday would be easiest for me.

CW:   [Thumbs up emoji]

26.    Between April 10 and 17, 2018, the CW and Jenkins exchanged multiple text messages in an attempt to coordinate schedules for a lunch meeting with the potential donors, ultimately deciding on the Piedmont Steakhouse at noon on April 18, 2018. That day, they exchanged the following messages at approximately 11:58 a.m.:

SJ:   I'm here.

CW:   Parking now.

27.    Also on April 18, 2018, at approximately 11:36 a.m., a user from the CCSO queried ███ in the National Crime Information Center ("NCIC"). NCIC is a criminal records database that law enforcement officers routinely use to determine if an individual has a criminal history. This query was run approximately twenty minutes before Jenkins texted the CW

advising that Jenkins had arrived at the meeting.

28.     On April 30, 2018, the CW texted "Hi Scott. Looking forward to the cool truck at the airshow. Thank you. Any chance of getting █ n █ sworn this week? Lmk." Jenkins responded the next morning. He wrote about some issues that had delayed his response and then wrote, "I'll check today on the guys and get back to you if we can make that happen."

29.     Over the next few months, the CW and Jenkins exchanged text messages that discussed completing the associated paperwork for █ to be sworn in as a reserve deputy and scheduling a time for █ to swear his oath as a reserve deputy. It was ultimately determined that █ would be sworn in on July 11, 2018, at 11:00 a.m. On that day, the CW and Jenkins exchanged the following texts at approximately 10:33:

> CW:    Did you want me to run █ down to get sworn or wait for you Sir? We are with █ now doing ID.

> SJ:    Be there in a few.

30.     I believe the campaign finance records, bank records, NCIC records, and text messages discussed above are corroborative of the CW's statements and establish probable cause that Jenkins, █ and others have engaged in a scheme to defraud the people of Culpeper of their right to honest services.

### █ Communications with Jenkins

31.     Subsequent to █ being sworn in as a reserve deputy, but before his check to the Committee was deposited, Jenkins texted the CW on two occasions regarding █ contact information.

32.     On October 8, 2018, at approximately 1:27 p.m., the CW and Jenkins exchanged the following messages:

> SJ:    Hey [first name of CW]. The [political party] is pressing for an answer on speaker in February for the Reagan Dinner. Can you get hold of █ and see if it's possible to [political figure] or not

9

CW:   Yes. Date again please.

SJ:   February 23

CW:   [████ contact card]

       He asked you to call him.

SJ:   Ok sure.

33.     Then, on October 20, 2018, at approximately 9:44 a.m., Jenkins texted the CW and asked, "Can you shout me ████ cell number please. I need him to get a message to [political figure] for me." The CW responded by sending ████ contact card again followed by a "thumbs up" emoji.

34.     I have reviewed records for phone number ████-1286, which is the cellphone number assigned to the iPhone. The records list ████ as the subscriber for the cellphone number from July 1, 2009, through at least March 27, 2022.

35.     Those same phone records show a call from Jenkins to ████ iPhone on October 8, 2018, at approximately 1:33 p.m., which was five minutes after the text exchange noted above between the CW and Jenkins. There was not a call from Jenkins to ████ in close proximity to the October 20, 2018, text messages.

36.     The records show that two different numbers I know to be used by Jenkins communicated with ████ iPhone a total of approximately 23 times, to include approximately 5 text messages, between October 8, 2018, and May 1, 2020.

37.     Although they originally introduced ████ to Jenkins, the CW stated ████ now communicates directly with Jenkins.

38.     The Device contains data that was extracted from ████ iPhone, which is capable of sending text messages via the iMessages application. I know from my training and experience that when the user of an iPhone sends a message to another iPhone user, that message is not transmitted as a text message on the carrier's network. Rather an iMessage is transmitted over the internet. Accordingly, iMessages do not appear in a user's toll records. The CW has

10

advised that Jenkins uses as many as three cellular phones at least one of which is an iPhone; the CW believed Jenkins's other two phones are iPhones as well but could not be certain. Thus, while toll records show ▮▮▮ and Jenkins have contacted each other approximately 23 times through ▮▮▮ iPhone, I believe there may be additional communications that are not captured in ▮▮▮ toll records.

39.       ▮▮▮ iPhone is currently in the lawful possession of the FBI. The iPhone was seized on June 30, 2020, pursuant to the execution of a search warrant issued by the United States District Court for the Eastern District of Virginia in an unrelated investigation (the "EDVA Warrant"). After seizing and extracting data from the iPhone -- but before reviewing its contents -- prosecutors in the EDVA investigation provided the data to ▮▮▮ counsel to review and make privilege assertions (i.e., ▮▮▮ counsel conducted a filter review). After that process was complete, all non-privileged data was provided to the EDVA investigative team.

40.       When I learned ▮▮▮ iPhone was in the custody of the FBI, I spoke with a Special Agent assigned to the unrelated investigation. In February 2022, that Special Agent queried the iPhone for communications between ▮▮▮ and Jenkins and provided me some of the material he found. I reviewed those communications.

41.       The EDVA Warrant authorizes seizure of, among other things, "[r]ecords . . . and other items which demonstrate the obtaining, secreting, transfer, expenditures and/or concealment of assets and money." Because ▮▮▮ communications with Jenkins relate to the expenditure of money, the communications are within the scope of the EDVA Warrant. I am seeking this additional warrant out of an abundance of caution and to authorize seizure of the additional data described in Attachment B.

42.       In September 2022, at the request of investigators on this case, a paralegal working on the EDVA investigation copied the non-privileged data onto the Device and provided it to me. This warrant seeks only to search the non-privileged data on the Device and to seize any evidence discussed in Attachment B.

11

## TECHNICAL TERMS

43.     Based on my training and experience, I use the following technical terms to
convey the following meanings:

      a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular
telephone) is a handheld wireless device used for voice and data communication
through radio signals. These telephones send signals through networks of
transmitter/receivers, enabling communication with other wireless telephones or
traditional "land line" telephones. A wireless telephone usually contains a "call
log," which records the telephone number, date, and time of calls made to and
from the phone. In addition to enabling voice communications, wireless
telephones offer a broad range of capabilities. These capabilities include: storing
names and phone numbers in electronic "address books;" sending, receiving, and
storing text messages and e-mail; taking, sending, receiving, and storing still
photographs and moving video; storing and playing back audio files; storing
dates, appointments, and other information on personal calendars; and accessing
and downloading information from the Internet. Wireless telephones may also
include global positioning system ("GPS") technology for determining the
location of the device.

      b.  Digital camera: A digital camera is a camera that records pictures as digital
picture files, rather than by using photographic film. Digital cameras use a
variety of fixed and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a computer or by
connecting the removable storage medium to a separate reader. Removable

storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that

13

are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

44.    Based on my training, experience, and from consulting the manufacturer's advertisements and product technical specifications available online at https://support.apple.com/guide/iphone/welcome/ios, I know that the iPhone from which the data on the Device was extracted has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience,

14

examining data stored on devices of this type can uncover, among other things, evidence that
reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45.    Based on my knowledge, training, and experience, I know that electronic devices
can store information for long periods of time. Similarly, things that have been viewed via the
Internet are typically stored for some period of time on the device. This information can
sometimes be recovered with forensics tools.

46.    *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as direct
evidence of the crimes described on the warrant, but also forensic evidence that establishes how
the iPhone from which the data on the Device was extracted was used, the purpose of its use,
who used it, and when. There is probable cause to believe that this forensic electronic evidence
might be in the data extracted from the iPhone because:

    a.  Data on the storage medium can provide evidence of a file that was once on the
        storage medium but has since been deleted or edited, or of a deleted portion of a
        file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the
        device. This "user attribution" evidence is analogous to the search for "indicia of
        occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may,
        after examining this forensic evidence in its proper context, be able to draw

15

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

47.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

48.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

16

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

49.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

50.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, search warrant, and search warrant return. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, such as causing the destruction of evidence, flight of conspirators, and tampering of witnesses.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

/s/ Scott Medearis
Scott Medearis, Special Agent
Federal Bureau of Investigation

17

Received by reliable electronic means and sworn and attested to by telephone on this

5th
_____ day of October 2022.

_____

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

18

## **ATTACHMENT A**

The property to be searched is a SanDisk flash drive bearing serial number BQ2203001185W (the "Device") containing filtered data extracted from an Apple iPhone 11 Pro, International Mobile Equipment Identity ("IMEI") number 353235100545552. The Device is currently located in the evidence control room of the FBI's Charlottesville Resident Agency located at 2211 Hydraulic Road, Suite 201, Charlottesville, VA 22901.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.    All records on the Device described in Attachment A that relate to violations of 18 U.S.C. §§ 1343, 1346 (honest services fraud) and 666 (bribery concerning programs receiving federal funds) and involve ▮▮▮▮ including:

   a.  Records of communication with or about Scott Jenkins, the Culpeper County Sheriff's Office, and its full time and reserve deputies;

   b.  Records of and communications about payment(s) or donation(s) directly or indirectly to Scott Jenkins or campaigns to elect sheriffs;

   c.  Financial records and financial transactions; and

   d.  Records of the iPhone's location.

2.    Evidence of user attribution showing who used or owned the iPhone from which the data on the Device was extracted at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.